THE STATE MUTUAL BUILDING AND LOAN ASSOCIATION

*v.*

EDWARD A. O'CALLAGHAN et al.

[Submitted January 5th, 1904. Decided March 1st, 1904. Filed July 9th, 1904]

1. On the foreclosure of a mortgage a decree *pro confesso* was taken and an order of reference made to a master to report the amount due. Defendant petitioned the court to correct the decree before sale, claiming that the decree was for too large a sum, exceeding by about five per cent.

the sum admitted to be due. The petition was denied. On appeal from the order denying the petition, and from so much of the decree as adjudged the amount due and directing a sale of the property, the court reversed the order denying the petition. Thereafter defendant moved that the sale under the foreclosure, made and confirmed pending the appeal, be set aside.—*Held*, that though the court on appeal determined that the owner of the equity of redemption of mortgaged premises has the absolute right to have the precise amount due on the mortgage judicially settled before the sale of the premises can take place, the sale would not be set aside.

2. A purchaser purchased at a sale under a mortgage foreclosure decree unimpeachable except as to the amount due the mortgagee. No notice was given at the sale of an appeal from an order denying an application for the correction of the amount adjudged to be due, and the only notice the purchaser had of such an appeal was such as might be imputed to him by the filing of the notice of appeal in the clerk's office three days before the sale. The sale was duly confirmed without objections or exceptions.— *Held*, that the purchaser was a *bona fide* purchaser.

3. A mortgagor neglecting to give notice at the sale under the foreclosure decree of his appeal from an order denying his application to correct the amount adjudged by the decree to be due the mortgagee, and failing to except to the confirmation of the sale, is, as against the purchaser, estopped from claiming that the sale is invalid.

4. An applicant to a loan association for a $40,000 loan was informed as to the terms under which loans were made, which were that applicants, on being accepted, became stockholders, required to pay fees for the stocks, monthly dues and premiums. He was informed that the initial payment for premiums and fees would be $1,000. He accepted the terms and received $39,000.—*Held*, that $1,000 originally deducted from the loan was a voluntary payment by the applicant, and hence he was not entitled to any credit therefor, either on account of principal or interest.

Hearing on petition of defendant O'Callaghan and answer of complainant thereto.

*Mr. Edward A. Armstrong,* for the complainant.

*Mr. James R. Bowen,* for Messrs. Goldstein & Fineburg.

*Mr. Fiske,* for the Commercial Trust Company.

*Mr. Warren Dixon,* for Mr. O'Callaghan.

PITNEY, V. C.

This matter comes before the court under peculiar and unusual circumstances.

The object of the bill is to foreclose a mortgage made by O'Callaghan and wife to complainant, dated November 9th, 1900, to secure the payment of $40,000 in one year, with interest, payable monthly.

The bill was filed November 2d, 1901, and alleged complete default in payment of interest, and also of dues under complainant's charter and by-laws in accordance with the terms of the mortgage and the terms of the bond given to secure the same debt.

Beside the defendant O'Callaghan and his wife, three judgment creditors of O'Callaghan were made parties defendant and duly served with process; and, no answer having been filed, a decree *pro confesso* was taken December 24th, 1901; and notice under the rule having been duly given by two of the judgment creditors that they desired to have their judgments passed upon by the master, an order of reference to a master was incorporated in the decree *pro confesso.*

In pursuance of that order the master made a report, dated January 8th, 1902, by which he found that there was due to the complainant on that day the sum of $45,132.92, which included dues, fines, interest and premiums in arrear to the amount of $8,753.32 less the withdrawal value of stock held by O'Callaghan in complainant's corporation, amounting to $3,620.40, being the full value thereof.

He also found that there was due to one judgment creditor $175.77, and to another $3,328.89, which, after adding costs of $155.33, made a total encumbrance of $48,792.91, with interest from January 8th, 1902, besides sheriff's execution fees.

Upon that report final decree was made January 18th, 1902, and execution issued accordingly to the sheriff of Hudson county. He duly advertised the property for sale on March 20th, 1902, at a place specified.

At that time and place the defendant O'Callaghan appeared with his counsel, and, at his request, the sheriff adjourned the sale for one week, to March 27th. On that day the defendant O'Callaghan and his counsel again appeared and procured an adjournment from week to week for four weeks, to April 24th.

On April 21st, 1902, counsel for defendant O'Callaghan pre-

sented to me a petition in which he set up briefly the proceedings in the cause, and in which he asserted that the decree was erroneous and oppressive

"in that the amount of interest due, together with the principal from November 9th, 1900, less the amount of $600 paid by your petitioner thereon, would be the sum of $2,000 only, and that the decree should have been for the sum of $42,155.33—principal, interest and costs."

The prayer was that the decree might be opened, and that *he might have such relief in the premises as equity and justice require* and all proceedings under *fieri facias* be stayed until the further order of the court.

Annexed to that petition was an affidavit by Mr. O'Callaghan, stating "that there is due on said bond and mortgage for principal and interest as aforesaid on January 8th, 1902, the sum of $42,000."

That petition was sworn to on April 15th, 1902, and an order was prepared to be presented with the petition to a vice-chancellor, which order bears date April 17th, 1902, and was, in fact, on or shortly after that date presented to a vice-chancellor, who declined to advise an order thereon.

On the presentation of that petition to me, and not being informed of the fact that the petition had been refused by another judge, and failing to observe the date written in the order, I advised the order, returnable on Monday, April 28th, 1902, calling on the complainant to show cause why the decree should not be opened, and ordered that all proceedings thereunder be stayed until the further order of the court, and that the sheriff adjourn the sale from week to week until the further order of the court.

The hearing on that order was adjourned, by consent, to May 22d, and at that hearing I was informed, for the first time, that there were defendants who had decrees in their favor who had not been, as I recollect, brought into the hearing on the present petition, by notice or otherwise, and that the sale had been adjourned for nine weeks.

I also learned that the amount found due by the master was actually due upon the bond executed by the defendant, and

which was mentioned in the mortgage, but that the defendant claimed that certain fines, premiums and monthly payments on stock which were covered by the bond were not specifically included in the verbiage of the mortgage.

It was also stated, and admitted by counsel, that the premises covered by the mortgage were what is known as tenement-house property, bringing in a large rent, and that the defendant was in possession, receiving the rents and profits.

I asked the counsel of the defendant, the petitioner herein, if he was willing that a receiver should be appointed at once to take the rents and profits pending the proceedings before the master to restate the account and ascertain the amount due. This he positively declined. Whereupon, being of the opinion that inasmuch as the petitioner admitted that there was $42,000 due upon the mortgage on January 8th, which with interest up to the time when the sale could take place and the deed be delivered would be at least $1,000 more, besides costs and sheriff's execution fees, and inasmuch as the judgment creditors clearly, by the practice of this court, were entitled to and had not received notice of the present proceedings, and the largest one of them—the Second National Bank of Jersey City—was a strong institution, with a considerable sum of money at stake and entirely able to take care of itself, and that it would probably bid the property up to its full value, and that complainant would naturally feel inclined to bid it up to the amount of its decree, it would be unfair and inequitable, not to say unlawful, to stay the sale, therefore, I discharged the rule, but with my own hand inserted in the order of discharge the words "without prejudice to defendant's right to renew the application after the sale of the premises."

Of course, it was within the power of the court to control the disposition of the proceeds of the sale, and on the (as it now appears, erroneous) view I then took of the rights of the parties and the proper mode of enforcing them, I should have added an order to the sheriff to withhold enough of the proceeds of the sale to cover the amount in dispute.

The premises were sold May 29th, 1902, to Messrs. Goldstein and Fineburg, for $46,505.

The sale was duly reported and confirmed without objection on June 9th, 1902, and the deed was delivered to Messrs. Goldstein and Fineburg, and they paid the consideration money and, in aid of such payment, obtained a loan from the Commercial Trust Company, which is now a mortgagee of the premises.

The amount paid and bid was some $362.60 less than the amount due the complainant by the decree at the date of the delivery of the deed.

No evidence was offered before me, on the hearing of the present matter, to show that the property did not bring its full value at the sale.

If defendant, after the sale, had pursued the remedy reserved to him by the order of May 22d, and had made prompt application to the court, an inquiry would have been made into the correctness of the master's report and any error found therein corrected, and the amount which the proceeds of the sale exceeded the amount really due the complainant would have been applied to the payment of the junior encumbrances, and if it exceeded the amount due thereon would have been paid as surplus money to the petitioner. There was ample time to arrest the purchase-money in the hands of the sheriff.

(It was admitted by his counsel that he paid no attention to and did not attend the sale, and gave no notice thereat of this appeal.)

The defendant, however, who is an attorney of the supreme court, was not advised to take that course, but, on May 26th, appealed from the order of May 22d to the court of errors and appeals.

His notice of appeal is as follows:

"The defendant, Edward A. O'Callaghan, hereby appeals from an order made on the twenty-second day of May, nineteen hundred and two, discharging an order to show cause why the final decree entered in this cause should not be opened, and from the whole and every part thereof.

"And the said defendant hereby appeals from so much of the final decree made in this court in the above-stated cause as declares that there is due to the complainant on the said mortgage the sum of forty-five thousand

and one hundred and thirty-two dollars and ninety-two cents ($45,132.92), and directing sale of said property to realize said amount to the court of errors and appeals in the last resort in all causes."

The petition of appeal is to the same effect.

After the hearing of that appeal, the court of errors and appeals entered a decree as follows:

"It is thereupon * * * ordered, adjudged and decreed that the order of the chancellor, made on the twenty-second day of May, nineteen hundred and two (filed May 23d, 1902), discharging the order to show cause returnable on the twenty-eighth day of April, nineteen hundred and two, be and the same hereby is in all parts reversed, and that the record and proceedings be remitted to the court of chancery, to be therein proceeded on according to law and the practice of said court."

Thus it will be seen that though the final decree was brought directly before the court of errors and appeals for review, it was not disturbed by that court.

After the entry of this decree of reversal, the petitioner moved, upon notice to complainant, to the purchaser at the sheriff's sale and to the mortgagee, as follows:

"Take notice, that on Monday, the second day of November next, at the chancery chambers in Jersey City, at ten o'clock in the forenoon, or as soon thereafter as counsel can be heard thereon, I shall apply to the court of chancery to set aside the sale by the sheriff of the property sold under execution issued in the above-entitled cause, and shall also apply to set aside all deeds and encumbrances and all proceedings had under or by virtue of said sale by said sheriff of Hudson county, and I shall apply for such other relief as may be proper or incidental to the reversal of the order made by said court on the twenty-second day of May, nineteen hundred and two, discharging an order to show cause, with stay theretofore made."

That motion was resisted by all the parties.

It was supported by counsel for petitioner upon two grounds— *first*, by the language of the judge who spoke for the court of errors and appeals, *65 N. J. Eq. (20 Dick.) 738*, upon which the decree of reversal was entered; and *second*, upon the strength of the case known as the *National Docks Case, 54 N. J. Eq. (9 Dick.) 647*.

With regard to the first ground: I declined, at the argument, to refer to the opinion of the court of errors and appeals, for the reason that I thought I was properly confined to the language of the decree of reversal.

My own learning and (until recently) unvaried experience have been that a decree of either modification or reversal granted by the court of errors and appeals should direct specifically what decree the court below should enter. This, according to my experience, has always been the practice, and, in my humble judgment, is the only proper practice.

For instance, if the decree appealed from be for complainant, and the opinion of the appellate court should be that the complainant was not entitled to any relief, but that the bill should have been dismissed, it is the duty of the counsel of the successful appellant to have it declared in the decree of reversal that the court below shall enter a decree dismissing the bill.

Or, if the court in such a case should hold that the complainant is entitled to some relief, but not to as much or the same that the court below has awarded him, the decree of reversal should state exactly to what relief he was entitled; then, when the decree of reversal or modification is presented to the court of chancery, it, by its decree, simply says "that in obedience to the mandate of the appellate court, it is decreed as follows," &c.

This practice, in my time at the bar, was carried so far that in complicated cases of reversal or modification the counsel for the successful party was expected to submit a draft of the proposed decree to the opposite party, and in cases of objection, then to the appellate court for approval.

Another reason why I declined to look at the opinion was that I had in mind at least one instance where I found that the actual decree entered in the appellate court did not correspond with the opinion. I refer to the case of *Pancoast* v. *Geishaker, 58 N. J. Eq. (13 Dick.) 537*. This will be seen by a copy of the actual decree in that case presented to me in the case of *Bacon* v. *Fay, 63 N. J. Eq. (18 Dick.) 411,* and copied by me at *p. 417*.

This risk of variance between the actual decree and the opinion of the court arises out of the well-known circumstance that until recently, at least, all the members of that court have not, at all times, had an opportunity to scan closely the opinion read or filed in the cause, and hence that opinion has not always expressed the views of a majority of the court, although they concurred in the result.

Above all, I thought, in a case like the present, where rights of third parties might and in fact did intervene, I ought to presume that if the higher court expected the court below to adopt any such radical, and, I may add, destructive, measure, it ought to and would have expressed clearly in its decree its mandate to that effect.

I have, however, since declining to set aside the sale, naturally examined with care the opinion of the learned judge who spoke for the court of errors and appeals. Upon such examination, I do not find any warrant therein for granting the motion in question. The opinion uses this language:

"The appeal from the final decree has, for obvious reasons, not been considered. The defendant pursued the proper course in bringing the matter to the notice of the court in which the cause was pending. We are dealing now with the action of the court below upon such application, and not with the final decree, which it is still holding under advisement.

"The order discharging the order to show cause must be set aside, and the cause be remitted, to be proceeded with from that point in the court below, in accordance with the views herein expressed."

I am not sure that I understand the precise force of the language used, as quoted, with regard to the final decree. If I am to understand that the court of errors and appeals presumes that this court is still holding the decree under advisement, and that it will, in obedience to the mandate, take up the proceeding at the point and in the situation of affairs when the order of May 22d, 1902, was made, and deal now with the final decree as it should have done at that time, then I have to say that, as I understand the practice of this court, all that this

court then would have done, after ascertaining and fixing the extent of the error in the amount due complainant, was to have made an order reducing accordingly the amount found due by the decree, and ordering a corresponding credit made on the execution, thereby modifying the direction to the sheriff as to the amount which he should levy.

It would not have vacated or set aside *in toto* the decree and the proceedings under it, so far as it ordered the property sold. This for the very good reason that the defendant admitted that about ninety-five per cent. of the decree was due, and he thereby admitted, in the absence of an offer of payment of the amount so admitted to be due, that the property must be sold.

So far, then, as the decree ordered the property sold, it was unimpeached and unimpeachable.

Moreover, the complainant was entitled, at law, to either immediate payment of the amount so admitted to be due or to the immediate possession of the premises.    Surely some regard should be paid by this court to the rights of complainant, and also to the rights of the parties holding subsequent decrees.

I find nothing in the opinion of the court of errors and appeals which conflicts with my views of the practice as just expressed.

The opinion does, indeed, as I read it, lay down emphatically the, to me novel, doctrine and rule that the owner of the equity of redemption of mortgaged premises has the absolute and unqualified right, under all circumstances, to have the precise amount due upon his mortgage judicially determined before the sale of the mortgaged premises can be permitted to take place.

This rule necessarily includes a review by the court of errors and appeals of the determination in that respect of the court below.    For, it must be observed, that this court, before the defendant's application was made, had judicially determined the amount due complainant in the ordinary and time-honored mode of a reference to a master, an investigation and report by him, and an express ratification and confirmation of that report by this court.    So that I must hold that the canon referred to includes the right to appeal from any determination of this court

of the amount due, and to have the sale stayed until that determination is had.

The effect of the rule so stated finds practical illustration in this case where the owner of the equity admitted in his application that ninety-five per cent., or thereabouts, of the amount so judicially determined and found due was actually due, and made no offer either to pay that amount or to hand over the rents and profits to the mortgagee pending·investigation.

The opinion further holds that the owner of the equity may, without prejudice to his rights in that behalf, pay no attention whatever to the judicial proceedings put in train to determine the amount so due, and may rely upon the master making no mistake either in the computation of the amount due or in the construction which he may put on the order of reference or its scope, for I conceive that the construction of the order of reference in the matter of its scope is necessarily within the judicial province of the master.

The opinion further holds that the owner of the equity may, with like immunity from prejudicial injury to his rights, neglect to take advantage of the time-honored rule of practice of this court which requires the execution to lie on file ten days after decree before issue, for the very purpose of enabling defendants to examine the report and decree and ascertain if any error has been made.

All this, I must assume, is now established law. What effect it may have in the way of encouraging defendants to interpose captious objections and take groundless appeals, remains to be seen.

But it does not reach far enough, as contended by counsel, to vacate, set aside and annul a sale regularly made under a valid and regular decree of this court, and afterwards confirmed without objection by a decretal order of this court and conveyance made thereunder to third parties.

The remaining point upon ·which the petitioner rested his motion was that the appeal taken from the order discharging the order of May 22d, 1902, had the effect, under the decision

8

in the *National Docks Case,* of rendering invalid further proceedings under the decree.

Here, again, I feel justified in saying that the supposition prevails with the bar that the members of the court, as then constituted, cannot be held to have approved all that was said by the late chief-justice in that case. I also feel justified in saying that the general sentiment of the bar of the state is that the doctrine there laid down must be limited in its application to cases strictly analogous to the case then before the court. Such seems to have been the view of Vice-Chancellor Emery, in *Delaware, Lackawanna and Western Railroad Co.* v. *Breckenridge, 55 N. J. Eq. (10 Dick.) 159* (at *pp. 162, 163*). In the same direction is the language of Mr. Justice Garrison, speaking for the court of errors and appeals, in the case of *Morlon* v. *Beach, 56 N. J. Eq. (11 Dick.) 791* (at *p. 792*).

The principle upon which the learned chief-justice went, and upon which the petitioner herein relies, is found on *p. 653* of *54 N. J. Eq. (9 Dick.),* and is to the effect that the right of the appellant is that he shall be, by an appeal, protected thoroughly against the result of any error into which the court below may have fallen.

A slight consideration of the numerous modes in which a chancellor may fall into error in applying the rules of equity shows that the end sought and claimed by the learned chief-justice is practically impossible under the present constitution of our courts.

Let us take one or two simple examples:

The owner of a recently erected house is charged by his neighbor with having placed a portion of it on his neighbor's land, and that neighbor demands its removal, and on failure of such removal threatens destruction of so much of it as is found on his land. The owner applies for an injunction on *ex parte* affidavits. The chancellor, to whom the application is made, adjudges that he has not made out a case calling for the interposition of the court, and signs an order refusing the application. The complainant appeals. The defendant at once destroys a portion of the house. The court of errors and appeals

reverses the order refusing the injunction and holds that the injunction should have been issued. Here it is manifest that the injured party can obtain no benefit from his appeal, unless we hold that an appeal will create an injunction, or unless the court of errors and appeals is then in session.

Now, suppose, in the case just stated, the chancellor had called on the defendant, by an order to show cause, to answer summarily the complaint of the owner of the house, and in the meantime had restrained him from injuring the house, and, after hearing in a summary way what the defendant had to advance in support of his right to abate what he considered to be a nuisance, had come to the conclusion that the defendant was right and the house-owner wrong, and had discharged the restraint, and the complainant had taken an appeal, and the defendant had at once destroyed the house, and the court of errors and appeals should hold that the complainant was entitled to restraint, why should there be any difference in the result in the two cases? Why should the mere fact that the chancellor had in one case decided in favor of the defendant without hearing him, and in the other case after hearing him, make any practical difference in the result?

I am unable to perceive any.

In each case judicial approval of the restraint is wanting at the time the building is destroyed, and the intrinsic difficulty lies in holding that there may be judicial restraint without judicial approval.

It has been the time-honored practice of the chancellors to exercise a discretion in the matter of the dissolution of a restraint, and in a case of doubt to continue the restraint until the next meeting of the court of errors and appeals, and this practice seemed, until the decision of the *National Docks Case,* to be the only remedy of the party seeking the restraint in the absence of a continued session of that court.

In short, the sentiment of the bar seems to be that the doctrine of the learned chief-justice, carried to its logical conclusion, results in this: that the complainant who has been refused an injunction by this court may obtain that injunction by simply appealing from the order of the chancellor refusing it, and may

obtain and enjoy the benefit of the extraordinary power of restraint of this court without the judicial approval of any court or judge. This, it is claimed, amounts to a *reductio ad absurdum.*

With regard to the importance of assuring to suitors the benefit of their appeals, I can only suggest that, in order to effect that result in all cases, the legislature, or some supreme power in the state, must provide a court of appeals which must either be in continuous session or have power by one or more of its judges to grant injunctions in vacation.

I shall add that, immediately after the promulgation of the opinion in question, the court of chancery, in order to guard against the injurious results which would arise almost certainly from the practical application of the doctrine that a restraint contained in a simple order might be continued by a mere appeal from the order discharging that restraint, adopted the practice of limiting the *interim* restraint to a particular day and hour, so that it came to an end without any order to that effect.

Turning now to the case in hand. Here, as before remarked, the sale was had under a perfectly valid decree, unimpeachable, except as to the amount due complainant, and as to that only to the extent of five per cent. Moreover, it was in the plural and included decrees for other defendants who had rights under it to have the sale proceed and whose rights are not in any way impeached. It stood as the actual, deliberate act of this court. No judicial order or opinion then in existence affected in the least its validity. No notice was given at the sale either that an effort had been made to stay it or that any appeal had been taken from an order discharging a stay. The only notice the purchasers had of those matters was such as may be imputed to them by the filing of the notice of appeal in the clerk's office three days before the sale. No authority was cited in favor of the position that the purchasers were bound to take notice of such filing. The authorities are all in the contrary direction and will be found collected in *Wiltsie Mort. For.* § 589, and *Kerr's Supp.* § 589.

I find no foundation for it in reason or justice. It would, in my opinion, never do to hold bidders to the duty of taking notice of the filing of papers of that kind up to the moment of sale. The well-established rule, I think, is that persons having such objections to a sale must give public notice at the sale. Further than that, the sale was duly reported to this court for confirmation, and ample time was given, according to the rules of this court, for objections to be made thereto. No objections or exceptions were made, and the sale was duly confirmed by a solemn decree of this court, directing the sheriff to complete the same. The purchasers, therefore, claim under a decree, or rather two decrees, of this court made in a matter in which it had undoubted jurisdiction, and they had and have the right to rely thereon. They became and were *bona fide* purchasers for a valuable consideration without any notice which this court can recognize of any weakness in the proceeding. The petitioner, by his neglect to give notice at the sale and to except thereto, is estopped as against the purchasers.

It follows that the sale has created vested rights in third parties. The land has been converted into money in due course of law. No complaint is made that it did not bring its full value.

Under all these circumstances I will not be the first judge to hold that all that proceeding must be undone. I can find no foundation for such action either in precedent or reason.

The well-settled rule is that sales to third parties under erroneous but unreversed judgments and decrees are valid. See *Freem. Exec.* § *345; Wiltsie Mort. For.*, and *Kerr's Supp., supra.*

Without, therefore, inquiring whether this sale can be disturbed in this summary mode upon a mere notice without pleading of any kind, I conclude this motion must be denied.

I come now to the action I took under the mandate of the court of errors and appeals immediately after denying the motion to set aside the sheriff's sale and conveyance.

I ordered the complainant, within fifteen days, to file and serve upon the solicitor of the defendant O'Callaghan his answer to his petition upon which the order to show cause was originally

granted, and that the petitioner have leave to bring on the hearing on the petition and answer on five days' notice.

This, I conceive, was a strict and complete obedience of the mandate of the court of errors and appeals and the language of the opinion.

The complainant duly filed his answer to the petition and the cause was brought on for hearing.

Testimony was heard and statements of counsel and admissions thereof made, and the following case was disclosed:

The petitioner inherited the premises in question from his father, subject to a mortgage of $30,000 and large arrearages of taxes and assessments. That mortgage was put in course of foreclosure, whereupon the defendant applied to the complainant, which is a building and loan association organized under the laws of the State of New Jersey, for a loan, and was granted a loan of $40,000. That application, according to the constitution and by-laws of the association, was, in form, an application to become a member, and to have allotted to him four hundred shares of stock, of the par value of $40,000.

He was fully apprised of the terms of the application, which were, among other things, that the stockholder should pay a fee of $1 for each share of stock, called an entrance fee; he was also to pay a monthly due of fifty cents for each share and a fine of ten per centum for non-payment of monthly dues, besides which a premium was exacted for the loan, and then the shares of stock, when issued, were to be held by the association as collateral security for the loan.

These matters were all explained to the defendant and the monthly rents of the premises were stated to be some $700 or more, and it was explained to him that the monthly dues under his loan would amount to nearly the amount of his rents, but that such monthly payments would go to increase the value of his stock, so that when the stock reached par in value his mortgage would be paid and satisfied and the result of the transaction would be the gradual paying off of his mortgage.

He was informed that the initial payment for premiums and entrance fees would be $1,000.

To this the defendant assented, and $39,000 was actually paid and advanced by complainant and the shares of stock were issued.

In all of this the defendant had the benefit of counsel, besides being, as I have already remarked, himself an attorney-at-law and a solicitor of this court.

The defendant paid none of his monthly dues, either by way of premiums or interest, and this suit for foreclosure was commenced, with the result already stated.

Of course, as defendant was duly served with process, and as he put in no answer, he could not set up surprise, except that the master's report was not authorized and warranted by the allegations in the bill, and this is the precise point which the court of errors and appeals decided in his favor, upon its merits, and upon which the case is now before me.

Coming to that point in the proceedings, I am of the opinion that the $1,000 originally deducted from the loan was a voluntary payment by him of the entrance fee and premium, duly and fairly exacted by the complainant under its constitution and by-laws, and voluntarily consented to by petitioner, and that the petitioner is not entitled to any credit therefor on account of either principal or interest thereon.

The question of usury was not raised, and it was assumed that it could not be raised successfully under the legislation authorizing the complainant's organization.

Hence the complainant is entitled to maintain its decree to the extent of $40,000, and interest thereon, which up to the date of the master's report, commencing with the date of the mortgage, November 9th, 1900, to January 8th, 1902, would be $2,800. (The complainant, in its statement, makes it $2,786.66.)

The difference of $2,352.92 between the amount of principal and interest and the amount found by the master, amounting to $45,152.92, is made up of premiums at the rate of fifty cents per share per month, monthly dues on four hundred shares, and fines for non-payment, amounting in all to $5,966.66; against which is credited what I interpret to be the withdrawal value of $3,620.40 of the capital stock, leaving $2,346.26 included in the

master's report for items not covered by the language of the mortgage.

But against this result the complainant contends that the neglect and inattention of petitioner to the proceedings before the decree, to which reference has already been made, viz., neglect to attend before the master, though as a solicitor well familiar with the practice of the court, his neglect to examine the decree and execution on file before the issue of the latter, and his neglect, as he alleges, to examine the execution in the sheriff's hands until after the property was advertised for sale, and his conduct after it was so advertised, were such as to bar him in equity from having this correction made in the master's report.

Complainant alleges that petitioner knew of the error at least as early as the property was advertised for sale, and probably sooner; that he deliberately procured adjournments and rested, without taking action, from March 20th until April 21st, and then, by applying to the court, procured further adjournments, so that the sale was actually delayed about ten weeks, during which time the defendant was receiving the rents and profits.

I think the allegation of knowledge by petitioner of the error in the decree, although denied by him, is sustained by the proofs.

The petitioner accounts for his conduct by stating that he was looking for a new loan on the premises, and this, I think, would naturally and almost necessarily lead him to ascertain from the sheriff the sum total of the amount to be raised by the execution. Moreover, proof was offered that on March 27th, the first adjourned day, counsel for defendant stated to counsel for complainant, who attended the sale, that the decree for complainant was much too large.

All these matters were, as I thought, proper matters for consideration on the motion to stay the sale. The court of errors and appeals thought otherwise.

But, I think, it does not lie in the mouth of the complainant to set up either defendant's non-action or his knowledge by way of estoppel.

In the first place, it has already received of the purchase-

money more, by about $2,000, than was due to it on the basis above stated; and, in the next place, it will receive interest in full, at the rate of six per cent., on a loan of $40,000, when in fact it only advanced $39,000. While I do not say that the terms of the original loan, as to dues, premiums and fines, were unlawful or usurious, I do say that they were so severe and hard as that a court of equity will not render any extraordinary aid to it in enforcing them.

The result of these views is that the complainant must be charged with the precise sum of money which it received, or should have received, from the sheriff as of the day when his deed was delivered, or should have been delivered, and should be credited with $42,800, and interest thereon, from January 8th, 1902, and costs of the suit, amounting to $155.33, with interest thereon from January 18th, 1902, to the same day, and that the balance found in its hands be paid into court, to await the further order of the court, after notice to the subsequent encumbrancers.

I do not charge interest against the complainant on that balance because I am of the opinion that the defendant O'Callaghan could have had that amount ascertained and immediately applied toward the subsequent encumbrances by simply taking advantage of the leave reserved to him in the order of May 22d, 1902.

His petition was not dismissed and some time necessarily and naturally elapsed between the sale and its confirmation in due course of practice. That time was ample for him to renew his application under the leave reserved. The moment that it appeared that the sale produced more than enough to pay what he admitted to be due by the terms of the mortgage, this court would have made an order retaining such excess within its control until its proper application could be judicially determined. There was not the least occasion for the expense and delay of an appeal.

Moreover, the evidence heard on the petition and answer satisfies me that it is highly probable that if the complainant's decree had been reduced before the sale to the amount above

stated, the property would not have produced more than the amount to which it was reduced.

The result is that the effect of the refusal to stay the sale was to produce the very fund which I shall order paid into court for the benefit of the petitioner and his creditors.

| | | | | |
|---|---|---|---:|---:|
| 1902. | | | | |
| June 23. | Amount of bid............................... | | | $46,505 00 |
| | Less sheriff's execution fees................... | | | 336 28 |
| | Received by complainant..................... | | | $46,168 72 |
| | Amount due complainant—principal... | $40,000 00 | | |
| | Interest from November 9th, 1901, to January 8th, 1902............... | 2,800 00 | | |
| | | $42,800 00 | | |
| | Interest thereon to June 23d, 1902.... | 1,178 00 | | |
| | Costs ................... $155 33 | | | |
| | Interest thereon from January 18th, 1902, to June 23d, 1902 ................... 4 08 | | 159 41 | |
| | | | | 44,137 41 |
| | | | | $2,031 31 |